# COURT OF APPEALS
# DECISION
# DATED AND FILED

## February 22, 2022

Sheila T. Reiff
Clerk of Court of Appeals

## NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.** **2021AP2035**
**2021AP2036**
**2021AP2037**
**2021AP2038**
**2021AP2039**
**STATE OF WISCONSIN**

Cir. Ct. Nos. **2020TP20**
**2020TP22**
**2020TP23**
**2020TP24**
**2020TP25**

**IN COURT OF APPEALS**
**DISTRICT I**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.P., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

N.H.,

      RESPONDENT-APPELLANT.

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO Z.W., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

  V.

**N.H.,**

       **RESPONDENT-APPELLANT.**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO **Z.W.**, A PERSON UNDER THE AGE OF **18**:

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**N.H.,**

       **RESPONDENT-APPELLANT.**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO **Z.W.**, A PERSON UNDER THE AGE OF **18**:

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

    **V.**

**N.H.,**

       **RESPONDENT-APPELLANT.**

---

IN RE THE TERMINATION OF PARENTAL RIGHTS TO **Z.W.**, A PERSON UNDER THE AGE OF **18**:

**STATE OF WISCONSIN,**

       **PETITIONER-RESPONDENT,**

**v.**

**N.H.,**

      **RESPONDENT-APPELLANT.**

---

APPEALS from orders of the circuit court for Milwaukee County: ELLEN R. BROSTROM, Judge. *Affirmed.*

¶1     BRASH, C.J.[1]  N.H. appeals the orders of the trial court terminating her parental rights to her five children: A.P., Z.C.W., Z.MN.W., Z.DN.W., and Z.CN.W.[2]  N.H. argues that there is insufficient evidence to support the findings that she is an unfit parent and that it was in the best interests of the children to terminate her parental rights. Upon review, we affirm.

## BACKGROUND

¶2     N.H. is the biological mother of A.P., born in July 2012; Z.C.W., born in August 2014; Z.MN.W., born in July 2015; Z.DN.W., born in October 2016; and Z.CN.W., born in October 2017.[3]

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] Although the middle initials of the children are not included in the captions of this case, we reference them here to differentiate among the children who have the same first and last initials.

[3] A.P.'s father is unknown. The biological father of the other four children was established, and his parental rights were terminated as well during these proceedings; he is not a party in this appeal.

¶3     In May 2016, the Division of Milwaukee Child Protective Services (DMCPS) received two referrals of neglect with regard to the three oldest children. There were concerns that N.H. had not been taking the children for routine medical care, as there were no documented medical records for them. Furthermore, Z.MN.W. was "extremely malnourished," weighing less than ten pounds, which was "significantly underweight" for her age of eleven months old. Z.MN.W. was determined to need emergency care, and was admitted to Children's Hospital.

¶4     Because N.H. failed to understand the seriousness of Z.MN.W.'s condition, DMCPS filed petitions for protection or services (CHIPS) for A.P., Z.C.W., and Z.MN.W. However, probable cause for removal from N.H.'s custody was found only with regard to Z.MN.W. at that time. To that end, N.H. was charged with one count of child neglect resulting in great bodily harm. She pled guilty; a sentence of two years of imprisonment was imposed but stayed, and she was put on probation for three years.

¶5     A trial reunification of Z.MN.W. with N.H. was attempted in August 2017. However, DMCPS received information in November 2017 from a family member of N.H. who had seen her and her children at Thanksgiving, and had observed N.H. "throw [Z.C.W.] onto the floor" causing him to hit his head on a dresser. The relative further reported that Z.MN.W. had a black eye, and Z.DN.W. had a "busted lip, 'as if someone had punched her in the face.'" N.H.'s case workers attempted to make contact with her, but she refused to answer her phone or the door when case workers went to her home.

¶6     A "pick-up" order was issued for all five children and, with the assistance of the police, the children were taken into DMCPS custody.   The children were then taken to Children's Hospital for evaluation for physical abuse, where the following was found:  A.P. had bruising to her stomach and one of her nipples; Z.C.W. had healing scars on his back and legs, bruising on his inner arm, legs, and back, and "looped" bruising on his foot, indicative of being hit with a belt or extension cord; Z.MN.W. had multiple bruises and healing scars on her arms, legs, and back, bruising around her neck and ears, and a residual black eye; Z.DN.W. was "significantly underweight," had a healed laceration on her lip that "should have received stitches," bruising and scarring on her legs, bruising around her neck and face, and two healing fractures in her right arm; and Z.CN.W. was underweight and had a small bruise on her face.  Additionally, both Z.DN.W. and Z.CN.W. had a torn frenulum—a "small bridge" of connective tissue in the mouth—which can be the result of an accidental fall in mobile children, or indicative of abuse from a direct blow or the forceful insertion of an object into the mouth.   Furthermore, in forensic interviews, A.P. told the interviewer that her mom had "kicked her in the eye" and pinched her nipples, and Z.C.W. said that his mom had punched him in the mouth and knocked out his tooth.

¶7     N.H. was charged with two counts of child neglect resulting in great bodily harm, and three counts of physical abuse of a child by intentionally causing bodily harm, all with habitual criminality repeater enhancers.  She subsequently pled guilty to two of the charges; the other charges were dismissed but read in at sentencing.   She was sentenced to eleven years of initial confinement to be followed by eight years of extended supervision, and is currently incarcerated.

Additionally, a no contact order was imposed prohibiting N.H. from having contact with the children.

¶8      The previous CHIPS order for Z.MN.W was extended, and CHIPS petitions were filed for the other four children.  Dispositional orders relating to the CHIPS petitions were entered in June 2018, listing a number of conditions that had to be met by N.H. before the children could be returned to her care.  Those conditions included resolving the criminal charges against her and committing no further crimes; committing no further physical abuse of the children; addressing her mental health issues; obtaining all necessary medical care for the children; and providing safe care for the children, including a "safe, suitable and stable home." The order also required regular visitation with the children.

¶9      N.H. failed to meet these conditions.  She told DMCPS that she was participating in mental health services while incarcerated, but did not provide any verification.  Furthermore, with the no contact order in place, N.H. was unable to meet the visitation requirement.  It was also noted that N.H. has a history of neglecting and abusing the children, and placing them in "grave danger" as evidenced by her two criminal convictions on these charges.  She also had a history of "not cooperating with services and hiding her children from DMCPS."

¶10      Therefore, petitions for the Termination of Parental Rights (TPR) of N.H. with regard to all five children were filed in February 2020.  In the TPR petitions, the State's alleged grounds for termination included the continuing need of protection or services for the children, pursuant to WIS. STAT. § 48.415(2), and the failure of N.H. to assume parental responsibility, pursuant to § 48.415(6).

¶11   A jury trial was held in April 2021.  N.H. testified, as did several members of the DMCPS case management team who worked with the family. Ultimately, the jury returned verdicts that all five children were in continuing need of protection and services, and that N.H. had failed to assume parental responsibility with regard to all five children.  Thus, the trial court made a finding of parental unfitness.   After a dispositional hearing, which commenced immediately after the trial, the trial court determined that it was in the best interests of the children for N.H.'s parental rights to be terminated.  This appeal follows.

## DISCUSSION

¶12   On appeal, N.H. argues that the evidence is insufficient to support the findings by the trial court that she is an unfit parent and that it was in the best interests of the children to terminate her parental rights.  "A jury's verdict must be sustained if there is any credible evidence, when viewed in a light most favorable to the verdict, to support it."  *Sheboygan Cnty. DHHS v. Tanya M.B.*, 2010 WI 55, ¶49, 325 Wis. 2d 524, 785 N.W.2d 369.   Furthermore, the "ultimate determination of whether to terminate parental rights" is a discretionary decision that lies with the trial court.  *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475.  The trial court erroneously exercises its discretion "if it does not examine the relevant facts, applies the wrong legal standard, or fails to use a demonstrated rational process to reach a reasonable conclusion."  *Brown Cnty. v. Shannon R.*, 2005 WI 160, ¶37, 286 Wis. 2d 278, 706 N.W.2d 269.

¶13   The trial court's finding that N.H. was an unfit parent was based on the jury's verdicts that the State had proven both grounds for termination—the

7

continuing need of protection or services for the children, and the failure of N.H. to assume parental responsibility. To prove the first ground, the State had to establish: (1) that each child had been placed outside the home for a cumulative total of six months or longer; (2) that DMCPS had made a reasonable effort to provide the services ordered by the trial court; and (3) that N.H. failed to meet the conditions set forth in the CHIPS order for the safe return of the children. *See* WIS JI—CHILDREN 324; WIS. STAT. § 48.415(2).

¶14 N.H.'s argument regarding this ground focuses on the second requirement—whether DMCPS's efforts to provide services to N.H. were reasonable. She asserts that her testimony during the trial established that "she felt that she was required to do the tasks that the DMCPS was ordered to perform, such as obtaining reports from the therapists and services providers." However, one of the case managers for N.H. explained during the trial that because N.H. was incarcerated, she could provide N.H. with only general information about the services available at the prison, not the specific classes and programs available there. Furthermore, the case manager testified that N.H. did not sign a release form in prison, which is required in order for the prison to share information with the case management team regarding her participation in programs, classes, and therapy.

¶15 Additionally, N.H. argues that DMCPS did not allow her to meet the visitation condition while she was incarcerated. This argument relates to the no contact order imposed by the trial court in her criminal case. N.H. asserts this was a condition of her bond, and was subsequently ordered at sentencing to apply only during her term of extended supervision, as opposed to being applicable during her

term of initial confinement. Although not referenced by N.H. in her brief, this argument presumably is based on language in her judgment of conviction, which indicates that there was to be no contact between N.H. and her children when she is released on extended supervision.

¶16 In contrast, the case manager testified that the no contact order was to remain in effect for N.H.'s total sentence. The case manager also noted that N.H. had raised the issue of the no contact order in her appeal of her criminal case.[4] As explained in the decision on appeal, during N.H.'s sentencing hearing, which took place in September 2018—while the CHIPS disposition orders were in effect—N.H.'s counsel noted that those orders required supervised visits between N.H. and the children, which was prevented by the no contact order. Counsel requested that the no contact order be modified to allow for potential compliance with the CHIPS orders while N.H. was incarcerated. The trial court flatly refused this request, stating that to "let [N.H.] have contact with her children in some fashion would unduly diminish the seriousness of these horrible crimes" and thus was "not even in the realm of what I believe is the appropriate sentence in this case."

¶17 This quote from the transcript of N.H.'s sentencing hearing clearly indicates that the trial court in the criminal case intended for the no contact order to be in effect during N.H.'s incarceration. In our decision—which affirmed N.H.'s conviction—we concluded that this was an appropriate exercise of the

---

[4] For purposes of maintaining confidentiality in this case, we are not providing the case information for N.H.'s appeal of her criminal conviction.

court's sentencing discretion. Furthermore, in the present case the case manager confirmed during her trial testimony that it was not within the authority of DMCPS to "overrule" the court's no contact order and arrange for visitation between N.H. and her children.

¶18 Based on this evidence, we reject N.H.'s claim that DMCPS did not make a reasonable effort to provide her with services as required under the CHIPS orders. A "reasonable effort" is defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child … the level of cooperation of the parent … and other relevant circumstances of the case." WIS. STAT. § 48.415(2)(a)2.a. As the State noted in its closing during the trial, most of the "barriers" that N.H. faced in meeting the CHIPS conditions can be attributed to herself: her conviction for the abuse and neglect of the children, the resulting no contact order, and her refusal to sign the release that would allow for more open communication between her case manager and her social workers in prison.

¶19 Furthermore, N.H.'s case manager testified that she had made regular contact with N.H. by phone while she was incarcerated to discuss planning and progress on the case. The case manager also stated that she sent letters with information about the children and general information regarding services available to N.H. in prison. We conclude that this evidence demonstrates that DMCPS made a reasonable effort to provide N.H. with services as ordered by the trial court. *See State v. Bodoh*, 226 Wis. 2d 718, 724, 595 N.W.2d 330 (1999) ("Statutory interpretation and applying a statute to a set of facts are both questions of law which this court reviews *de novo*.").

10

¶20 We next turn to N.H.'s argument that there is insufficient evidence to support the ruling that the State proved the second ground—failure to assume parental responsibility, in accordance with WIS. STAT. § 48.415(6). This ground is proven by establishing that N.H. did not have a "substantial parental relationship" with the children. *See* § 48.415(6)(a). A substantial parental relationship is demonstrated when a parent accepts and exercises "significant responsibility for the daily supervision, education, protection and care" of his or her children. Sec. 48.415(6)(b). The court "must look to the totality[ ]of[ ]the[ ]circumstances" and "should consider a parent's actions throughout the entirety of the child's life when determining whether he [or she] has assumed parental responsibility." *Tammy W.-G. v. Jacob T.*, 2011 WI 30, ¶¶22-23, 333 Wis. 2d 273, 797 N.W.2d 854. The court may also consider whether the parent "exposed [his or] her child to a hazardous living environment." *Id.*, ¶22.

¶21 A review of the circumstances in this case reflect that A.P. has not been in N.H.'s care for almost half of her life, and the other four children have not been in her care for more than half their lives. Furthermore, N.H. has two convictions relating to her abuse and neglect of the children, for which she remains incarcerated in prison. Although "a parent's incarceration does not, in itself, demonstrate that the individual is an unfit parent," it is certainly relevant, especially given the nature of N.H.'s crimes and the fact that a no contact order with the children was imposed. *Kenosha Cnty. DHS v. Jodie W.*, 2006 WI 93, ¶¶48-49, 293 Wis. 2d 530, 716 N.W.2d 845.

¶22 Additionally, there was little participation by N.H. with regard to the children's care after they were removed from her care. N.H. testified that although

11

she had received contact information regarding the children's providers while she was incarcerated, including teachers, therapists, and medical providers, she did not attempt to initiate contact with them because she was "[n]ot sure that [she] was able to" under the no contact order. The case manager testified that N.H. had eventually requested contact with the children's therapists, and she had facilitated that contact. The case manager also stated that she had facilitated a meeting between N.H. and the children's teachers regarding appropriate assessments for the children. However, the case manager further testified that N.H. repeatedly attempted to contact the children through their foster parents, which was prohibited under the no contact order.

¶23 Based on the totality of the circumstances, we conclude there is sufficient evidence to support the jury's verdict that N.H. failed to assume parental responsibility throughout the entirety of the children's lives. *See Tammy W.-G.*, 333 Wis. 2d 273, ¶¶22-23. Therefore, because there is credible evidence to support the verdicts regarding both of the grounds for termination, we will not disturb the trial court's finding that N.H. was an unfit parent. *See Tanya M.B.*, 325 Wis. 2d 524, ¶49.

¶24 Next, we turn to N.H.'s argument that there was insufficient evidence to support the trial court's finding that it was in the children's best interest to terminate her parental rights. In making this determination, the trial court should reference the factors set forth in WIS. STAT. § 48.426(3):

> **(a)** The likelihood of the child's adoption after termination.
>
> **(b)** The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.

**(c)** Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.

**(d)** The wishes of the child.

**(e)** The duration of the separation of the parent from the child.

**(f)** Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

While the trial court must consider these six factors, it may also consider "any evidence relevant to the issue of disposition[.]" *Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856.

¶25      The record reflects that the trial court considered all of the factors of WIS. STAT. § 48.426(3).  Indeed, N.H. does not argue that it did not; rather, she argues that the court improperly gave "great emphasis" to N.H.'s conviction and incarceration.  However, as we have already discussed, this is properly considered in determining whether a substantial relationship exists between a parent and child—the third factor for consideration.  Sec. 48.426(3)(c).  N.H.'s conviction clearly reflects that the children were subjected to a "hazardous living environment" under her care, *see Tammy W.-G.*, 333 Wis. 2d 273, ¶22, and the nature of her crimes is certainly relevant to this analysis, *see Jodie W.*, 293 Wis. 2d 530, ¶¶48-49.

¶26      In short, the trial court examined the relevant facts, applied the correct legal standard, and reached the reasonable conclusion that terminating N.H.'s parental rights was in the children's best interests; it therefore did not

erroneously exercise its discretion in doing so. *See **Shannon R.***, 286 Wis. 2d 278, ¶37. Accordingly, we affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.